UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

| | |
|---|---|
| DIEOMATIC INCORPORATED d/b/a COSMA CASTING MICHIGAN, an Iowa corporation, | Case No. |
| | HON. _____ |
| Plaintiff, | |
| v | |
| GENERAL ALUMINUM MFG. LLC d/b/a GENERAL ALUMINUM MFG. COMPANY, an Ohio limited liability company, | |
| Defendant. | |

Ronald G. DeWaard (P44117)
Brion B. Doyle (P67870)
Jeffrey D. Koelzer (P78602)
VARNUM LLP
*Attorneys for Plaintiff*
P.O. Box 352
Grand Rapids, MI 49501-0352
(616) 336-6000
rgdewaard@varnumlaw.com
bbdoyle@varnumlaw.com
jdkoelzer@varnumlaw.com

**VERIFIED COMPLAINT**

NOW COMES PLAINTIFF, Dieomatic Incorporated d/b/a Cosma Casting Michigan ("Plaintiff" or "CCMI"), by and through its attorneys, Varnum LLP, and for its Verified Complaint, states as follows:

**INTRODUCTION**

1.      The Defendant, General Aluminum Mfg. LLC d/b/a General Aluminum Mfg. Company, ("General Aluminum") supplies certain automotive parts (the "Parts") to Plaintiff

pursuant to a requirements-contract purchase order.  In material breach of the parties' contract, General Aluminum unequivocally informed Plaintiff that General Aluminum was terminating the supply agreements and would no longer supply parts unless Plaintiff agreed to massive price increases totaling millions of dollars through the remaining life of the program.  These demanded price increases are based on nothing other than Defendant's desire to recoup added costs in the face of fluctuating market prices. Defendant has no right to demand a price increase or cease shipments under the parties' contract. Plaintiff secured a few weeks of immediate supply by paying Defendant's extorted prices under protest, as Plaintiff's production lines would have otherwise been idled.  Then on May 17, 2023, Defendant refused to agree to supply beyond May 29, 2023, unless Plaintiff agreed to permanently increase prices and reduce maximum weekly volume requirements. If Defendant continues to refuse to ship Parts in the absence of its demanded price increases, the harm to Plaintiff and the disruption in the automotive industry will be catastrophic, including a direct impact to Plaintiff's customer, General Motors ("GM").

2.      The consequences of the supply interruption from Defendant's continued refusal to deliver the Parts at issue will be substantial and irreparable, including among others: (i) millions of dollars per week in direct and immediate monetary losses; (ii) a shutdown of assembly lines at GM, (iii) the layoff or idling of countless employees up and down the supply chain, and (iv) immeasurable harm to the goodwill and reputation of CCMI in the automotive industry.

3.      Accordingly, this Court's immediate intervention is required in order to enter a temporary restraining order and/or preliminary injunction, compelling Defendant to immediately release Plaintiff's required shipments and to deliver the parts at the times and in the quantities ordered by Plaintiff going forward, such that the status quo may be preserved while the merits of the dispute are fully resolved.

4.      CCMI seeks immediate and permanent injunctive relief ordering Defendant to resume manufacturing and supplying certain unique automotive components to CCMI in accordance with binding supply agreements between CCMI and Defendant.  These parts are indispensable to CCMI's exclusive manufacture and supply of components for incorporation into vehicles manufactured by GM.

## PARTIES, JURISDICTION, AND VENUE

5.      CCMI is an Iowa corporation with its principal place of business in Battle Creek, Michigan. CCMI is a Tier 1 automotive supplier, supplying automotive powertrain assemblies to original equipment manufacturers (OEMs).

6.      Defendant is an Ohio limited liability company with its principal place of business in Ohio.  Upon information and belief, there is complete diversity of citizenship among the owners or members Defendant and CCMI.

7.      The amount in controversy in this matter exceeds $75,000, exclusive of interest and costs.

8.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

9.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

## BACKGROUND

### A.      DEFENDANT AGREES TO SUPPLY AND DELIVER CCMI'S REQUIREMENTS OF THE PARTS FOR THE LIFE OF THE OEM PROGRAM.

10.      Like most Tier 1 automotive suppliers and all OEMs, CCMI employs a "just-in-time" inventory management system, whereby CCMI orders the parts from suppliers as necessary for the manufacture and supply of parts which, in turn, is dictated by CCMI's OEM customers.  As such, CCMI maintains hardly any excess inventory or "bank" of the Parts for future production needs, but rather, relies on timely shipments from Defendant.

3

11.     CCMI issued a purchase order to Defendant (a copy of which is attached hereto as **Exhibit A**), which Defendant accepted and began performance under.

12.     The Purchase Order was originally issued on April 17, 2019 and subsequently amended.

13.     The version of the Purchase Order attached to the Complaint is the most recent version, made effective March 30, 2022.

14.     In general, the Parts are cast aluminum front "cradles" or subframes that CCMI in turn supplies to GM.  At present, CCMI is unable to obtain the Parts from an alternate source.

15.     The Purchase Order is made expressly subject to CCMI's Purchase Order Terms and Conditions (the "Terms," a copy of which is attached hereto as **Exhibit B**), as is expressly noted on the face of each Purchase Order at issue: "Buyer's Purchase Order Terms and Conditions, which are available on the internet at www.magna.com, are incorporated by reference herein and form and integral part hereof." *See* Purchase Order, Ex. A.

16.     The Purchase Order at issue in this case, together with the incorporated Terms, is a valid and binding contract between the respective Plaintiff and Defendant, and is referred to herein as the "Supply Agreement."

17.     The Terms state that the Purchase Order is an offer that may be accepted by silence and/or performance thereunder, among other methods of acceptance:

> The first occurring expression of acceptance of this Order by Seller, including Seller's (i) written acceptance, (ii) commencement of work on the goods subject to this Order (the "Goods"), (iii) shipment of the Goods, (iv) commencement of performance of all or any portion of the services subject to this Order (the "Services"), (v) failure to object to this Order, in writing, within ten (10) days of receipt of this Order, and (vi) conduct that indicates Seller's acceptance, including preparation for Seller's performance, shall constitute an acceptance of Buyer's offer.  If Seller objects, Seller's objections are deemed waived if Seller subsequently commences work on the Goods, or upon shipment of the Goods or

4

performance of the Services without an express written modification made by Buyer . . . .

Terms ¶ 1(a), Ex. B.

18.     The Terms provide that any acceptance of the Purchase Order is "is limited to and conditional upon Seller's acceptance of the Terms" and that:

> Any proposal for additional or different terms or any attempt by Seller to vary any of the Terms, whether in Seller's quotation form, acknowledgement form, invoice, correspondence or otherwise, shall be deemed material and is hereby objected to and rejected by Buyer, but any such proposal or attempted variance shall not operate as a rejection of this Order if Seller accepts Buyer's offer by commencement of work, shipment of the Goods or performance of the Services, or by other means acceptable to Buyer, in which case this Order shall be deemed accepted by Seller without any additional or different terms or variations whatsoever.

*Id*.

19.     The Purchase Order itself also specifies that acceptance is limited to the terms of the Purchase Order and the Terms, and preemptively rejects any additional or different terms. *See, e.g.*, Purchase Order, Ex. A ("SELLER'S ACCEPTANCE OF THIS PURCHASE ORDER IS LIMITED TO THE TERMS AND CONDITIONS SPECIFIED ABOVE AND INCORPORATED BY REFERENCE HEREIN, AND ADDTIONAL OR DIFFERENT TERMS OR CONDITIONS PROPOSED BY SELLER ARE HEREBY REJECTED, UNLESS OTHERWISE EXPRESSLY AGREED IN WRITING BY BUYER AND SIGNED BY BUYER'S AUTHORIZED REPRESENTATIVES.").

20.     The Terms specify that the Purchase Order "does not constitute an acceptance of any prior offer or proposal by Seller . . . ." Terms ¶ 1(a).  The Terms also contain an integration clause, providing:

> This Order contains the entire agreement between Buyer and Seller and, except as otherwise expressly stated in this Order, supersedes all prior agreements, orders, quotations, proposals and other communications relating to the subject matter

hereof and there are no other understandings or agreements, verbal or otherwise, in relation hereto that exist between Buyer and Seller.

*Id.* ¶1(b).

21.    The Terms further provide that the Purchase Order is binding on the parties "for the length of the production life of the applicable original equipment manufacturer ("OEM") vehicle program for which Buyer intends to incorporate the Goods or Services." *Id*. ¶2(a).

22.    The Terms make clear that the parties have a requirements contract, stating that the Purchase Order creates an irrevocable option pursuant to which CCMI may purchase the Parts from Defendant "in such quantities and on such delivery dates and times as indicated in the firm delivery or shipping releases . . . issued or transmitted by Buyer to Seller from time to time in reference to this Order . . . and Seller shall deliver such quantities on such dates and times, at the price and on the other terms specified in this Order . . . ." *Id*. ¶ 5(b).

23.    The Purchase Order further provides that General Aluminum agrees to meet a capacity of 300 parts per day, 5 days per week, 47 weeks per year, plus an additional weekly max capacity rate of 15%, resulting in an agreed maximum capacity of 1,725 parts per week. *See* Purchase Order, Ex. A, at 3.

24.    Nothing on the face of the Purchase Orders or the Terms provides any right for Defendant to modify the unit price under the circumstances of this case. *See* Terms, Ex. B, ¶ 13(b); ¶ 36 ("No modification of this Order, including any waiver of or addition to any of the Terms, shall be binding upon Buyer, unless made in writing and signed by Buyer's authorized representative.").

25.    The Terms further provide that "Seller warrants that the prices in this Order shall be complete, and no surcharges, premiums or other additional charges of any type shall be added, without Buyer's prior written consent. Seller expressly assumes the risk of any event or cause

6

(whether or not foreseen) affecting such prices, including any foreign exchange rate changes, increases in raw materials costs, inflation, increases in labor and other manufacturing costs." *Id*. ¶ 13(b).

26.      In the event of Defendant's failure or refusal to deliver Parts as required, the Terms require Defendant to reimburse CCMI for all "excess costs incurred" as well as all other "direct, consequential, and incidental damages incurred by Buyer as a result of Seller's failure to meet the delivery dates or times … including the cost of any line shutdown and the cost of obtaining goods from an alternate source." *Id*. ¶ 6(a).

27.      Defendant accepted all terms of the Purchase Order by beginning performance by shipping.

28.      The releases for the Parts that CCMI issues under the Supply Agreements require Defendant to make Parts available for CCMI on a regular basis, typically each week.  CCMI maintains hardly any excess inventory.

29.      If Defendant continues to refuse to deliver the Parts as required under the parties' Supply Agreements, CCMI will run out of Parts to supply to GM.  As CCMI runs out of each of the Parts at issue, the GM production lines that rely on the Parts will be forced to shut down immediately thereafter.

**B.      GENERAL ALUMINUM BREACHES THE SUPPLY AGREEMENT BY IMPROPERLY REFUSING TO SHIP PARTS UNLESS CCMI AGREES TO PAY MILLIONS OF DOLLARS FOR ALLEGED COST INCREASES.**

30.      Beginning in the second half of 2022, Defendant has consistently failed to meet the quantities required in CCMI's weekly releases.

31.      Under the terms of the Purchase Order, as amended and restated, CCMI is entitled to require weekly quantities of up to 1,725 Parts per week.

7

32.    Defendant has consistently failed to meet CCMI's weekly required quantities, providing fewer Parts than requested on numerous occasions since August 2022.

33.    Defendant's failure to ship Parts in the amounts required by CCMI's releases is a breach of the Supply Agreement.

34.    CCMI has incurred downtime charges from GM as a result of General Aluminum's failure to meet required volumes, in addition to incurring other damages.

35.    In addition, Defendant has shipped defective parts to CCMI in breach of the Supply Agreement, which further impaired CCMI's ability to meet the needs of GM.

36.    In order to mitigate its damages and ensure continued supply, CCMI has provided assistance to Defendant in the form of sorting companies, maintenance personnel, production reporting support, capital equipment, shipping and logistics support, management consultation, volume planning, maintenance planning, engineering support, tooling design, product simulation, and customer interface in an effort to improve quality, improve capacity, and decrease costs for Defendant.

37.    In addition, CCMI has attempted to find other suppliers who may be able to supply replacement parts, subject to approval of its customer GM.  However, at present, CCMI has not identified any suppliers that are able to provide substitute parts that GM has approved.

38.    Despite CCMI's efforts to accommodate Defendant's production shortfalls, on April 28, 2023, Defendant sent a letter to CCMI indicating that Defendant would stop shipping parts unless CCMI agreed to an extracontractual price increase of $50 per Part, representing an increase of more than 40%.  *See* General Aluminum April 28, 2023 correspondence, attached as **Exhibit C**.

39.     As set forth above, Defendant has no right to demand price increases under the parties' Supply Agreement, and Defendant expressly assumed any and all risk of increased costs and raw materials.

40.     Defendant's letter indicated that it required the price increase because of challenges from "schedule fluctuations, inflation, wage increases, higher energy cost and transportation costs." *Id.*

41.     CCMI responded the next business day by letter reminding General Aluminum that it had no right to demand a price increase, and that General Aluminum had assumed the risk of any increases in raw materials costs, inflation, increases in labor, and other manufacturing costs. *See* May 1, 2023 correspondence, attached as **Exhibit D**.  Despite its receipt of this correspondence, General Aluminum remained unwilling to supply Parts to CCMI at the stated contract price.

42.     As a result, CCMI was forced to secure a few weeks of immediate supply by paying General Aluminum's extorted price increases under protest in order to prevent a shutdown of assembly lines at GM.  But for CCMI's agreement to pay Defendant's exorbitant price increases under protest, CCMI would have run out of the Parts on or about May 1, 2023, which would have left CCMI unable to comply with its obligations to its end customer, GM.

43.     On May 15, 2023, General Aluminum demanded that CCMI enter into a new contract that would make the $50 price increase permanent and further demanded a reduction in maximum weekly volume. *See* May 15, 2023 correspondence, attached as **Exhibit E**.

44.     In a follow up email on May 17, 2023, General Aluminum made clear that absent an agreement to permanently raise the price and reduce maximum weekly volumes, General

Aluminum would stop shipments of the Parts beginning May 29, 2023.  *See* May 17, 2023 correspondence, attached as **Exhibit F**.

45.     Thus, despite CCMI's agreement to pay General Aluminum's price increases under protest, General Aluminum has renewed is threat to terminate supply unless the price increase is made permanent and the maximum weekly volumes are reduced.  As a result, CCMI has been unable to secure continued supply by paying the higher price under protest and is at risk of imminently running out of Parts, which will soon thereafter shut down production at GM.

**COUNT I – BREACH OF CONTRACT**

46.     The foregoing allegations are incorporated by reference as if fully restated herein.

47.     The parties' Supply Agreement constitutes a valid and binding contract.

48.     CCMI is in full compliance with its contractual obligations and has otherwise fully performed under the parties' contract, satisfying all conditions precedent (if any) to Defendant's return performance under the Supply Agreement.

49.     Defendant has materially breached and/or repudiated its obligations under the Supply Agreement as alleged herein by failing to meet periodic release quantities, delivering defective Parts, and clearly indicating its refusal to deliver future shipments of the Parts to CCMI as and when specified in CCMI's material releases and required under the terms of the Supply Agreement.

50.     As a direct and proximate result of Defendant's breach of contract, CCMI has suffered, and will continue to suffer, substantial direct, incidental, and consequential damages, including attorneys' fees and costs, and irreparable harm.

**COUNT II - INJUNCTIVE RELIEF**

51.     The foregoing allegations are incorporated by reference as if fully restated herein.

52.     The Supply Agreement constitutes a valid, enforceable, and mutually binding agreement between CCMI and Defendant.

10

53.     CCMI is in full compliance with its contractual obligation and has otherwise fully performed under the Supply Agreement, satisfying all conditions precedent (if any) to Defendant's return performance under the Supply Agreements

54.     Defendant has materially breached and/or repudiated its obligations under the Supply Agreement as alleged herein by failing to meet periodic release quantities, delivering defective Parts, and clearly indicating its refusal to deliver future shipments of the Parts to CCMI as and when specified in CCMI's material releases and required under the terms of the Supply Agreement.

55.     Absent immediate injunctive relief, CCMI will suffer immediate and irreparable harm, including, (i) millions of dollars per day in direct and immediate monetary losses for each day that CCMI is without supply of the Parts; (ii) a shutdown of CCMI's related manufacturing facilities and GM's assembly plants, (iii) the layoff or idling of countless employees up and down the supply chain, and (iv) immeasurable harm to the goodwill and reputation of CCMI with its customers in the automotive industry around the world, especially its relationship with GM. The monetary damages caused by this cascading effect are not readily ascertainable.

56.     The public interest weighs in favor of the issuance of an injunction requiring Defendant's continued production and delivery of the Parts as required under the Supply Agreement.

57.     CCMI has fully performed all of its obligations under the Supply Agreement, and Defendant is unilaterally breaching the Supply Agreement by refusing to perform.

58.     CCMI is likely to succeed on the merits of its claims.

59.     Defendant will suffer no prejudice or harm by merely continuing to perform its contractual obligations to supply CCMI pursuant to the terms of the Supply Agreement.

60.     The balance between the irreparable harm CCMI will suffer and any injury Defendant could suffer (which is none) favors CCMI.

61.     CCMI is entitled to injunctive relief, which will simply maintain the status quo, until a decision is made on the merits of this matter.

## COUNT III - SPECIFIC PERFORMANCE

62.    The foregoing allegations are incorporated by reference as if fully restated herein.

63.    CCMI's supply relationship with Defendant is governed by the Supply Agreement.

64.    The Supply Agreement constitutes a valid, enforceable and mutually binding agreement between the parties.

65.    Defendant's obligations under the Supply Agreement are unambiguous, ascertainable and sufficiently explicit to warrant enforcement.

66.    Defendant has materially breached and/or repudiated its obligations under the Supply Agreement as alleged herein by clearly indicating its refusal to deliver future shipments of the Parts to CCMI as and when specified in CCMI's material releases and required under the terms of the Supply Agreement.

67.    Defendant's failure and refusal to perform consistent with its contractual obligations leaves CCMI without an adequate remedy at law.

68.    CCMI cannot reasonably and timely "cover" for the Parts, which are unique, if Defendant does not perform under the Supply Agreement.

69.    CCMI is entitled to Defendant's specific performance of all terms of the Supply Agreement, including Defendant's obligations to manufacture and deliver the Parts as and when required under the terms of the shipping releases issued by CCMI.

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests the Court to issue an Order providing for:

A.    Temporary, preliminary, and permanent injunctive relief preventing Defendant from taking any action inconsistent with its supply obligations to Plaintiff;

B.      Temporary, preliminary, and permanent injunctive relief requiring Defendant to supply Plaintiff with the quantity of Parts necessary to satisfy Plaintiff's requirements as provided under the Supply Agreement;

C.      Temporary, preliminary, and permanent injunctive relief requiring Defendant to adhere to the parties' agreed upon prices under the Supply Agreement;

D.      A decree of specific performance requiring Defendant to supply Plaintiff with the quantity of Parts necessary to satisfy Plaintiff's requirements as provided under the Supply Agreement;

E.      An award of money damages in favor of Plaintiff sufficient to compensate it for all forms of economic loss including, without limitation, actual, consequential and incidental damages, attorneys' fees and costs, amounts it has been wrongly forced to pay to secure supply, cover damages, lost profits, lost goodwill and other costs incurred as a result of Defendant's breach of contract; and

F.      Such other relief as this Court may deem just, equitable or appropriate under the circumstances.

## VERIFICATION

I, Matthew Garner, am the Vice President of Operations for Dieomatic Incorporated d/b/a

Cosma Casting Michigan.  I am authorized to verify the foregoing Verified Complaint and do so

based on my personal knowledge, company books and records, and/or matters made known to me.

I declare under the penalties of perjury that this Verified Complaint has been examined by me and

that its contents are true to the best of my information, knowledge, and belief.  For those matters

stated upon information and belief, I believe them to be true after reasonable inquiry.


Executed on May 18 2023.                                      _____

                                                                                    Matthew Garner
                                                                                    Vice President of Operations
                                                                                    Dieomatic  Incorporated  d/b/a  Cosma  Casting
                                                                                    Michigan

Respectfully submitted,

VARNUM LLP
Attorneys for Plaintiff

Dated: May 18, 2023                    By:___*/s/ Brion B. Doyle*_____
                                             Ronald G. DeWaard (P44117)
                                             Brion B. Doyle (P67870)
                                             Jeffrey D. Koelzer (P78602)
                                             P.O. Box 352
                                             Grand Rapids, MI 49501-0352
                                             (616) 336-6000

21036923.2

15